**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION : | |
| OF THE UNITED STATES OF AMERICA : | Mag. No. |
| FOR AN ORDER TO DISCLOSE THE : | |
| LOCATION DATA FOR SPRINT CELL : | |
| PHONE NUMBER (202) 200-3296, : | UNDER SEAL |
| ESN:  270113179913753111 : | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ORDER
TO DISCLOSE CELLULAR TELEPHONE LOCATION DATA**

I, Christopher Ray, Special Agent with the Federal Bureau of Investigation ("FBI"), Washington Field Office, Washington, D.C. (hereinafter "affiant"), being duly sworn, deposes and states as follows:

**INTRODUCTION**

1. I have been a Special Agent of the FBI since 2008. I have received training and have experience in interviewing and interrogation techniques, surveillance techniques, arrest procedures, search and seizure, and asset forfeiture; and in gang, organized crime, money laundering, and drug investigations, including the possession with intent to distribute and distribution of controlled substances, and conspiracies and offenses associated with the foregoing criminal offenses which are prohibited by 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and 18 U.S.C. §§ 922(g), 924(c), 1956 and 1957.

2. Your affiant is presently assigned to the Safe Streets Task Force in the Washington Field Office of the FBI in Washington, D.C. This particular Task Force investigates violent street gangs and crews in Washington, D.C. in which most members are involved in the distribution of narcotics. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the

organization of drug conspiracies.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques:  interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short- and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance, including wire interceptions; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

   3. Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business, including the transportation of narcotics from importers to wholesalers and from wholesalers to street level dealers, as well as the packaging and hiding of narcotics, payment methods for narcotics, and laundering of the proceeds of illegal narcotics transactions.  I also know through training and experience that wholesale distributors frequently change their places of residence and/or their primary places of conducting their narcotics transactions so as to avoid working from a fixed location where they might be the subject of physical surveillance by law enforcement authorities and often do not have legitimate employment or sources of income.  Additionally, I know through training and experience that narcotics traffickers frequently use cellular telephones to further their illegal activities, as the phones allow them to stay in contact with one another without restricting them to a fixed location where they might be the subject of physical surveillance by law enforcement authorities, and often because they erroneously believe that interception of cellular communications

is impossible or at least more difficult than interception of land-line telephones. I also know through training and experience that narcotics traffickers frequently move from place to place to pick up narcotics from their sources of supply and deliver narcotics to their customers and pick up narcotics trafficking proceeds from their customers and deliver the proceeds to their sources of supply, all the while using varying vehicles, methods, locations, and routes so as to avoid detection by law enforcement authorities conducting surveillance and to avoid the identification through their travel and interactions of their sources of supply and customers.

4. On the basis of information provided by a Confidential Informant and Undercover Officer, consensual monitored telephone calls, controlled narcotics purchases, and pen register and toll record telephone analysis, I allege the facts to show that there is probable cause to believe that information concerning the location of the cellular telephone presently assigned number (202) 200-3296, with Electronic Serial Number ("ESN") 27011317991375311, presently subscribed to Tony Adams, with a listed address of 514 60th Street, NE, Washington, D.C.; with cellular service provided by Sprint; used by WILLIAM HARRIS LEWIS, JR, (hereinafter the "target telephone"), will constitute or yield evidence of violations of the controlled substances laws (21 U.S.C. §§ 841, 846) being committed by LEWIS and others, known and unknown. Agents currently are receiving data regarding the use of the target telephone via a pen register and a trap and trace device.

## THE INVESTIGATION

5. In July 2011, your affiant began to investigate the suspected criminal activities of a group of individuals who appear to be distributing heroin to a network of customers in the Kenilworth Gardens housing community located in the vicinity of the 4400-4500 blocks of Quarles Street, NE, the 1500-1600 blocks of southbound Kenilworth Avenue NE and the alleys that run

between and behind Quarles Street NE, 45th Street NE, and Pond Street NE, Washington, D.C. The organization includes, but is not limited to, TONY LAMONT ADAMS aka "Kenilworth Fats" and WILLIAM HARRIS LEWIS, JR. aka "Pooh". Based upon the facts of this investigation, as well as your affiant's training and experience, your affiant has reason to believe ADAMS and LEWIS, and others are distributing large quantities of heroin to customers based in the Kenilworth Gardens area located in Northeast, Washington, D.C.

6. The narcotics trafficking activity of this organization is principally centered in the Kenilworth Gardens housing community located in Northeast, Washington, D.C. Although this is the main distribution location of the organization, confidential informant information has indicated that some distribution may occur in other areas, including the Congress Heights housing community located in Southeast, Washington, D.C. and the 600 block of Division Avenue located in Northeast, Washington, D.C.

7. In April 2011, a Confidential Informant (hereafter referred to as CI-1) told agents ADAMS was a large-scale distributor of heroin that operates primarily in the Kenilworth Gardens housing community. The FBI initiated an investigation, and throughout the next several months agents developed substantial evidence that ADAMS was indeed engaged in the distribution of cocaine and collaborated with LEWIS to further their drug trafficking organization. This evidence includes consensual monitored telephone calls, controlled narcotics purchases, and pen register and toll record analysis.

8. On July 27, 2011, CI-1 met with detectives of the Metropolitan Police Department (MPD) to participate in a controlled narcotics purchase of heroin from TONY ADAMS. CI-1 called ADAMS' telephone number 202-276-8368 to arrange the purchase of one gram of heroin for $130

in the Kenilworth Gardens area in Northeast, Washington, D.C. Immediately after this telephone call, toll records indicate that ADAMS called telephone number 202-200-3296, which based on investigation is the telephone number used by WILLIAM HARRIS LEWIS, JR aka Pooh. CI-1 then proceeded to the area and called ADAMS to advise him that he/she was in the area and waiting to conduct the drug transaction. ADAMS told CI-1 that he was not there, but his "man" Pooh was there and would take care of CI-1. Moments later, a black male (later identified as WILLIAM HARRIS LEWIS, JR. aka Pooh) walked over to CI-1 and engaged in a short conversation with CI-1 before selling him/her one gram of heroin for $130 in MPD pre-recorded funds. After the drug transaction was complete, LEWIS entered a white 2004 Chevrolet Suburban bearing Maryland license plate 4AA9898, registered to William Harris Lewis, Jr. at 7302 Cipiano Springs Road, Lanham, Maryland 20706.

9. On August 26, 2011, CI-1 met with detectives with the Metropolitan Police Department (MPD) to participate in a second controlled narcotics purchase of heroin from TONY ADAMS. CI-1 was also directed to introduce MPD Undercover Officer #3105 (hereafter referred to as UC-1) to ADAMS for the purpose of the UC to purchase heroin from ADAMS. CI-1 called ADAMS' telephone number 202-276-8368 to arrange the purchase of two grams of heroin for $260 in the Kenilworth Gardens area in Northeast, Washington, D.C. Shortly after this telephone call, toll records indicate that ADAMS called telephone number 202-200-3296, which based on investigation is the telephone number used by WILLIAM HARRIS LEWIS, JR aka Pooh. A short while later, CI-1called ADAMS on the target telephone and said that he/she was in the area and waiting to conduct the drug transaction. Once again, ADAMS told CI-1 "to go see Pooh", who was already in the area. CI-1 and UC-1 proceeded to the courtyard area where they were approached by LEWIS. CI-1

introduced UC-1 to LEWIS for the purpose of purchasing two grams of heroin.  LEWIS instructed UC-1 to walk with him over to the side of one of the apartment buildings adjacent to the courtyard.  LEWIS then removed a plastic bag containing numerous small green zip lock bags of heroin.  LEWIS gave UC-1 two of the zip lock bags of heroin in exchange for $260 in MPD pre-recorded funds.  UC-1 and LEWIS then walked back over to CI-1 after the drug transaction was complete.  Prior to leaving the area, LEWIS told CI-1 (in the presence of UC-1) his telephone number was 202-200-3296 and instructed CI-1 to put the telephone number in his/her phone in order to contact him in the future.

10. On September 22, 2011, CI-1 and UC-1 met with MPD detectives and your affiant for the purpose of conducting a controlled narcotics purchase of heroin with ADAMS or LEWIS.  First, CI-1 called ADAMS' telephone number 202-276-8368, but did not get an answer.  CI-1 then called LEWIS' telephone number 202-200-3296, who also did not answer.  Two minutes later, LEWIS called CI-1 back and LEWIS agreed to meet CI-1 and UC-1 in the Kenilworth Gardens area for the purpose of selling them 10 grams of heroin for $900.  Approximately 12 minutes later, ADAMS called CI-1 in response to the earlier missed call.  CI-1 told ADAMS that he/she had already spoke to LEWIS and arranged the drug transaction.  ADAMS told CI-1 that he and LEWIS were on their way from Maryland and would meet with CI-1 and UC-1 when they arrived in the area.  Approximately 25 minutes later, LEWIS arrived in the area driving his white 2004 Chevrolet Suburban.  ADAMS was not with LEWIS at this time.  LEWIS directed the CI-1 and UC-1 to get into his vehicle to conduct the drug transaction.  UC-1 was seated in the front passenger seat and CI-1 was seated in the rear passenger seat of LEWIS' vehicle.  LEWIS removed a clear plastic baggy containing 10 small green zip lock bags of heroin from the driver's side door compartment and

handed it to UC-1 in exchange for $900 in FBI pre-recorded funds. LEWIS then advised UC-1 to get his telephone number from CI-1 for the purpose of conducting future drug transactions. UC-1 and CI-1 exited LEWIS' vehicle. Shortly thereafter, LEWIS was seen by surveillance units driving out of the area in his vehicle.

11. On October 6, 2011, UC-1 met with MPD detectives and your affiant for the purpose of conducting a controlled narcotics purchase of heroin with ADAMS' co-conspirator, LEWIS. UC-1 called LEWIS' telephone number 202-200-3296, who agreed to meet UC-1 in the Kenilworth Gardens area for the purpose of selling him/her 10 grams of heroin for $900. UC-1 and a second MPD Undercover Officer (hereafter referred to as UC-2) proceeded to drive to the area. Once LEWIS arrived in the area, he called UC-1 on the telephone and informed him/her to meet him in his vehicle that was parked on Ponds Street, NE. UC-1 entered the front passenger seat of LEWIS' vehicle while UC-2 waited outside of LEWIS' vehicle. LEWIS then gave UC-1 10 small green zip lock bags of heroin in exchange for $900 in MPD pre-recorded funds. After the drug transaction was complete, UC-1 exited LEWIS' vehicle and left the area with UC-2. Moments later, LEWIS was observed by surveillance units walking in the 4300 block of Quarles St., NE.

12. Your affiant believes that ADAMS and LEWIS are co-conspirators in a drug trafficking organization operating in the Kenilworth Gardens area and other areas within metropolitan Washington, D.C. Furthermore, based upon information from CI-1, your affiant believes that ADAMS and LEWIS frequently communicate with each other via cellular telephone to arrange drug transactions with mutual drug customers to further their drug trafficking operations.

13. Your affiant does not believe that LEWIS resides at the address listed in the subscription information for the target telephone, and agents have been unable to identify his principal place of residence. Your affiant believes that the location data for the target telephone will assist agents in identifying LEWIS' residence, his stash houses, customers, and sources of supply.

### INVESTIGATIVE PURPOSES OF THE
### CELLULAR TELEPHONE LOCATION DATA

14. Based on your Affiant's training and experience, one of the most useful, undetectable, and reliable ways to identify patterns of activity of a criminal target and to quickly and safely locate a criminal target is to evaluate the pattern of calls made to and from the target's cellular telephone, and to obtain information identifying subscribers for these calls, and to then conduct an investigation concerning those individuals. Based upon that subscriber information, agents then can direct other investigators to conduct surveillance at these individuals' addresses and to determine if the criminal target is present at times when the criminal target's cellular telephone is present in the geographic area served by an active cell-site.

15. Information acquired by analysis of cell sites discloses only the location of an antenna tower. Like plugging a conventional phone into a "wall-jack," the wireless telecommunications providers quickly and accurately detect which one of their "wall-jack" cell-sites is accessed by a mobile phone; and, armed with knowledge of that cell-site's physical tower location, agents can inferentially approximate the target telephone's location, at best to within several square miles, at call beginning and end. This approximated location can be used to corroborate the observations of surveillance agents and to anticipate future movements and locations by establishing the target's habit or pattern. For example, if a target's first and last wireless calls of the day occur in the same

cell site, then the geographic footprint of the area covered by that cell site should correspond to the general location where the target is residing, working or sleeping. If there are several known addresses, as identified through subscriber records derived from a pen register or trap and trace device or otherwise, in that same cell site's coverage area, then there is a good possibility that the target is residing with or visiting one of those individuals.

16. While the information acquired by cell-site analysis (which is created and stored in the ordinary course of business each and every time the mobile phone makes or receives a call) can be coarse and non-specific, information obtained from the telecommunications providers using their "Enhanced 911" tools (such as GPS fixes, triangulation, cell-site "pings," received signal strength indicator (RSSI), and timing offset analysis, hereinafter collectively referred to as "E-911 tools") can be much more precise. More precise information allows investigators to get closer to the actual handset. Some of these E-911 tools are not records that exist in the ordinary course of business and often are not created unless the user of the phone dials "911." Thus, unless a provider has reason to believe a mobile phone's user is in distress (typically by virtue of a 911 call), telecommunications providers will require a court order to create, record and disclose these electronic records to law enforcement. Your affiant submits that there is probable cause to support a court order to require the creation of these records and to compel the disclosure of these records for the target telephone. These records, however, are never so precise as to establish the phone's presence in a particular house or apartment and cannot be relied upon as a sole basis for attempting warrant service at any particular location.

17. Whether the FBI receives real-time cell site information or requests the provider to disclose E-911 location information, no government "device" is involved. Rather, cell-site records

are passed contemporaneously with pen register and trap and trace data from the accessing cell site to the local Mobile Telephone Switching, which forwards the information to the provider's central collection facility (i.e. their law enforcement relations/court order bureau offices).  From there, the provider authorizes the data stream for release to the FBI through its CALEA-compliant network.

18.     Similarly, when the FBI requests E-911 tools in an attempt to locate the physical handset, no government "device" is used.  Rather, the provider will query the phone, which must be on, to ascertain its location through a two-way data dialogue.  That information is captured and stored by the provider and passed on to the investigative agency orally or in writing (e.g. email or fax).

19.     Once your affiant receives an order for the type of information requested herein, it is served upon the target telephone's service provider.  Once received, it is catalogued and assigned to an electronic surveillance representative, who, based on caseload, will "provision" the target telephone for delivery in the appropriate "switches," thereby instructing those switches to forward the information to the provider's central collection point.  "Provisioning" can occur at any time and, except for exigent cases, is dictated solely by the provider.  Thus, the FBI cannot control whether the Order will be electronically implemented during day or night.

## CONCLUSION

20.     Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that information, including cell site information and information obtained from E-911 tools, concerning the location of the cellular telephone presently assigned telephone number (202) 200-3296 with Electronic Serial Number 270113179913753111, presently subscribed to Tony Adams, with a listed address of 514 60th Street, NE, Washington, D.C.; with cellular service

provided by Sprint ; used by WILLIAM HARRIS LEWIS, JR., will constitute or yield evidence of violations of the controlled substances laws (21 U.S.C. §§ 841, 846) being committed by LEWIS and others, known and unknown.

                                              CHRISTOPHER M. RAY, Special Agent
                                              Federal Bureau of Investigation

Sworn and subscribed to before me this _____ day of October, 2011.

                                              DEBORAH A. ROBINSON
                                              UNITED STATES MAGISTRATE JUDGE
                                              DISTRICT OF COLUMBIA